UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

Dorothy PRESSER,

               Plaintiff,

      -against-                             <u>MEMORANDUM AND ORDER</u>
                                                      01 - CV - 8059

KEY FOOD STORES CO-OPERATIVE,
Inc.,

               Defendant.

-------------------------------------------------x

GLASSER, United States Senior District Judge

## **INTRODUCTION**

      Plaintiff Dorothy Presser ("Plaintiff" or "Presser") originally brought this action against Defendants Key Food Stores Cooperative, Inc. ("Key Food" or "Defendant") and Grocery Haulers, Inc., under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 626 <u>et seq.</u>, the Older Worker's Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626 (f), the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 <u>et seq.</u>, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 <u>et seq.</u>, and the New York City Human Rights Law ("NYCHRL"), Title 8 of the New York City Charter & Administrative Code.  Presser and Grocery Haulers, Inc. have subsequently settled.

## **PROCEDURAL HISTORY**

      By Memorandum and Order dated December 3, 2002, <u>Presser v. Key Food</u>, 2002 WL 31946714, (E.D.N.Y.2002) ("Presser I"), this Court dismissed Presser's claims under

the ADEA and the OWBPA, leaving only claims under the WARN Act, NYSHRL and NYCHRL.  In a subsequent order of this Court, <u>Presser v. Key Food Stores Co-op., Inc.</u>, 218 F.R.D. 53, 21 IER Cases 68 (E.D.N.Y.2003) ("Presser II"), Plaintiff was granted leave to amend the Complaint to include a class of nonunion and union Key Food employees who allegedly received ineffective WARN Act notices prior to being laid off and did not sign releases of their WARN Act claims.  In <u>Presser II</u>, the Court denied Plaintiff's request to include a class of individuals who had signed releases of claims against Key Food on the grounds that such an addition would be futile.

Plaintiff now moves to amend her WARN Act claim, certify subclasses, and for summary judgment on WARN Act liability.  Defendant cross moves for summary judgment on the WARN Act claim and the age discrimination claims under NYSHRL and NYCHRL.

## **FACTS**

Local Rule 56.1 places the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts.  <u>See</u> <u>Monahan v. New York City Dept. of Corrections</u>, 214 F.3d 275, 292 (2d Cir.2000).  It requires a party moving for summary judgment to submit a statement of undisputed facts together with citation to the admissible evidence of record supporting each fact.  (<u>See</u> Local Rule 56.1(a), (d)).  If the opposing party then fails to specifically controvert a fact with citation to contrary admissible evidence in the record, that fact will be deemed admitted.  (<u>See</u> Local Rule 56.1(c)(d)).  "[W]here there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62, 73 (2d

Cir.2001).  Each party has presented the Court with a 56.1 Statement supporting its

motion for summary judgment on the WARN Act claim.  Because the relevant facts are

more easily discernible therein, the Court refers to Defendant's 56.1 Statement.  Plaintiff

errantly responded not to Defendant's properly filed 56.1 Statement, but to the

Statement of Facts included in Defendant's Memorandum of Law.  Thus, the Court has

independently determined which of Defendant's WARN-Related statements of fact are

properly supported by the record.  Citations in Section II, Age Discrimination-related

Facts, refer to Defendants' 56.1 Statement on Plaintiff's Discrimination Claims.

## I.  WARN-related Facts

Key Food is a co-operative that services more than one hundred member

supermarket stores in the New York metropolitan area.  Key Food formerly operated a

warehouse at 8925 Avenue D, in Brooklyn, New York (the "Warehouse").  Several

departments, including the printing department, operated out of the Warehouse until

July 2000 when Key Food sold a portion of its business to Grocery Haulers, Inc. and

ceased to operate the Warehouse.  (56.1, ¶ 1).

Plaintiff Dorothy Presser was hired by Key Food on or about June 3, 1976 as a

typesetter in the printing department.  Throughout her employment with Key Food, Ms.

Presser worked in the print shop adjoining the Warehouse.  As a typesetter, Ms. Presser

was responsible for setting type for newspaper advertisements and signage placed in the

stores.  (56.1, ¶ 2).

In early 2000, Grocery Haulers, which had taken over Key Food's perishables

operation in 1997, offered to purchase the Warehouse operations.  (Id.).

Key Food produced a letter dated March 10, 2000, which was distributed as a

WARN Act notice to the unrepresented warehouse employees.  (56.1, ¶ 4).  This letter, reads, in relevant part:

> We are regretfully taking this opportunity to advise you that effective May 1, 2000, a permanent mass layoff or plant closing will occur arising out of the sale of a portion of the business and the services of employees of Key Food Stores Co-Operative, Inc. (the "Company") at its warehouse located at 8925 Avenue D, Brooklyn, New York 11236, and its satellite warehouse located at 663 East 56th Street, Brooklyn, New York, will no longer be required as of that date.  The Company hopes to be able to retain a number of administrative personnel and the Company hopes that the entity purchasing the assets will offer employment to a substantial number of former employees of Key Food.  Nevertheless, in accordance with the applicable law, this notice is given to you pursuant to the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101.

> Under such circumstances where all employees will be subject to the mass layoff or plant closing, there will be no bumping rights which may be asserted by those affected employees.

> Appropriate WARN notices are being sent to Ms. Susan Luck, New York State Department of Labor . . . and the Honorable Rudolph W. Giuliani, Mayor of the city of New York . . .

> The name, address, and telephone number of a Company representative to contact is Mr. Ronald D. Phillips, Controller, Key Food Stores Co-Operative, Inc., 8925 Avenue D, Brooklyn, New York 11236, (718) 451-1000.

(Pallitto Aff., Ex. 3).  Key Food also produced a signature log, bearing Presser's signature, on which employees were asked to acknowledge receipt of "Mr. Pallitto's March 10 letter." (Pallitto Aff., Ex. 6 ("signature log")).

Key Food sent substantially similar WARN Act notices by certified mail to local officials on March 16, 2000, and to John Gilligan, the President of Bakery Drivers Local 802 ("the Union"), which was the collective bargaining representative for the unionized employees working in the Warehouse at all relevant times.  (56.1, ¶6).

Because Key Food did not own the Warehouse, but leased it from the City of New

York, Grocery Haulers required either a sublease or the City's consent to an assignment of the lease as part of its purchase of the Warehouse operations. (Pallitto Aff., ¶ 13). The original transaction contemplated an initial sublease of the Warehouse lease by Key Food to Grocery Haulers, with a subsequent assignment of that lease by Key Food to Grocery Haulers. (Id.). After executing sale documents, however, Grocery Haulers had difficulty obtaining financing because Key Food could only deliver a sublease at closing, rather than an assignment. (Id., ¶4). With a transaction that became dependent, in part, upon the approval of the City of New York to assign the lease, the proposed closing of the transaction was postponed on several occasions. (Id.).

The transaction was delayed on three occasions. On or about April 21, May 24 and June 22, 2000, Key Food produced additional notices reflecting these delays and extending the date of the anticipated closing. (56.1, ¶ 5, See also Pallitto Aff., Ex. 7-10, 12-19). As with the original notices, these notices were produced in triplicate, addressed to the Union President, local officials, and unrepresented employees. (Id.). Also as with the original WARN notices, corresponding certified mail receipts corroborate that the letters were sent to the President of the Union and local officials on or about the dates of the additional notices. (Id.). Key Food distributed the additional notices to the unrepresented employees with their paychecks on April 21, 2000, May 24, 2000, and June 22, 2000. (See Pallitto Aff., ¶¶ 13, 16, 17; Phillips Dep., 208-210).

Essentially, each of these notices made reference to the first notice, repeated its contents, and informed the recipients that because of continued negotiations, the transaction and the layoffs would be postponed to a new date. The April 22 letter extended the anticipated layoff date from May 1 to May 15; the May 24 letter extended

the date to June 19; and the June 22 letter extended the date to July 17, 2000.  (Id.).

The June 22 additional notice addressed to "Associate[s]" reads as follows:

> As you are aware, on or about March 10, 2000 the Company provided you with notice that there would be a mass layoff and/or plant closing arising out of the sale of a portion of the business, and that the services of employees at the Company's facilities at 8925 Avenue D, Brooklyn, New York and at its warehouse located at 663 East 56th Street, Brooklyn, New York would no longer be required as of May 1, 2000.  That notice was given pursuant to the WARN Statute, 29 U.S.C. § 2101.  As before, the Company hopes to be able to retain a number of administrative personnel and the Company hopes that the entity purchasing the assets will offer employment to a substantial number of former employees of Key Food.
>
> By reason of, among other things, the continuing transition between Key Food Stores Co-Operative, Inc. and Grocery Haulers, Inc., we are taking this opportunity to advise you that the permanent plant closing and/or mass layoff will not take place until on or about July 17, 2000.  This notice is given pursuant to the WARN Statute and its regulations, including 20 C.F.R. § 639.10.
>
> [. . .]
>
> The name, address and telephone number of a Company representative to contact is Mr. Ronald D. Phillips, Controller, Key Food Stores Co-Operative, Inc., 8925 Avenue D, Brooklyn, New York, 11236.  (718) 451-1000.

(Pallitto Aff., Ex. 16).

Presser acknowledges receiving the June 22 additional notice.  (Presser Dep. at 36-38).  However, despite her signature on a log sheet acknowledging receipt of the March 10 letter, (See Pallitto Aff., Ex. 6), and that there had been recent rumors that the plant might be closing, she denies receiving any of the earlier letters, or any notice whatsoever from Key Food, that the plant would be closing.  (Id. ("Q: ...[P]rior to June 22nd, you had not received any notice from Key Food that there was going to be a plant closing?  A: No.")).  Moreover, she testified that she was reassured by her boss, Richard

Schwartz, that even if the plant closed, her job would be safe.  In her deposition, she stated:

> A:     . . . I wasn't worried at that time whether I was going to have a job or not because Richard Schwartz told us that the Printing Department was definitely staying with Key Food.
>
> Q:     When did he tell you that?
>
> A:     As soon as the rumor started floating that Key Food was going to close down or was going to sell the warehouse, Richard Schwartz told us, the entire department, he said, "Not to worry.  Our department is solid.  We will not be going anyplace."
>
> Q:     Now, when you say when the rumors started swirling, was that prior to having received this letter?
>
> A:     There were rumors about selling the warehouse, yes, for many years.
>
> Q:     I see.  And when you referred to Mr. Schwartz saying, "Don't worry. The Printing Department won't be going anywhere."  When did he say that?  Was that in the prior months prior to June of 2000?
>
> A:     When the rumor started going around I guess everyone just looked at Richard, we were wondering what was going on.  But he said not to worry; it had nothing to do with the Printing Department; it was all the warehouse.
>
> Q:     No.  I understand that.  The question is, when did he make that statement?
>
> A:     I don't exactly remember when he made that statement.
>
> Q:     Well, do you think it was in the year prior to receiving the [June 22 notice]?
>
> A:     I don't know about a year prior to that but I'm sure it's maybe a couple of weeks before that.
>
> Q:     I see.  So the rumors starting [sic] swirling several weeks before you actually received the notice?
>
> A:     The rumors about closing was, [sic] yes.

(Presser Dep. 40-41).

When the closing of the sale actually took place on Saturday, July 29, 2000 there were approximately 270 total layoffs.  (Phillips Aff., ¶ 21).   The Union employees, however, were rehired immediately by Grocery Haulers without any loss in work time. (56.1, ¶ 7).  Some of the non-union members, including some members of the printing department, were also hired by Grocery Haulers or retained by Key Food.  (Phillips Aff.

¶ 20). Nowhere in the record is it clearly indicated how many non-union individuals were either not retained by Key Food or hired by Grocery Hauler.

Despite efforts made by Schwartz to assist Presser in obtaining a new job with either Key Food or Grocery Haulers, (see Schwartz Aff. ¶¶ 6-10, Phillips Aff. ¶¶ 13), Presser, along with two of the six other members of the printing department, was one of the non-union employees who was laid off and not subsequently rehired by either Grocery Haulers or Key Food. (Phillips Aff. ¶ 20). Key Food offered all employees who were laid off and did not belong to the Union, including Presser, one week of severance pay for each year of service, up to ten weeks, in exchange for a general release. (Phillips Aff., ¶ 23). Because Presser had been employed by Key Food for 24 years, she was offered ten weeks' severance pay in exchange for the release. (Phillips Aff., ¶ 23). She rejected the severance offer. (56.1, ¶ 20).

## II.     Age Discrimination-related Facts

Key Food maintained a written anti-discrimination policy which it routinely distributed to its employees. (56.1, ¶ 3). Although there was a procedure for reporting allegations of age-related employment discrimination, Presser never reported any incidents of discrimination. (Id.). When asked about the substance of her age discrimination claim, she testified as follows:

> Q:     Alright. Now, from the time that you started working at Key Food,
> up until approximately, let's just call it January of 2000, all right,
> did you have any problems at Key Food with respect to
> discrimination?
> A:     Well, no.
> Q:     Okay?
> A:     I did have, at one time I had different problems which had to do
> with medical [insurance].
> Q:     Okay. But as far as the allegations in your Complaint that you

|     | might have been discriminated against because of your age? |
|-----|--------------------------------------------------------------|
| A:  | No. |
|     | *** |
| Q:  | Do you believe you were treated fairly on a day-to-day basis at Key Food? |
| A:  | Yes. |
| [. . . ] | |
| Q:  | The crux of your complaint was that when you were terminated you believe that your age had something to do with that? |
| A:  | That's correct. |

(Presser Dep. at 16-17, 25).

As of July 2000, and before the sale of the Warehouse operations, the following individuals were employed in the printing department: (a) Robert Berge, Pressman (55 years old); (b) Janice Leanza, Mail Clerk (50 years old); (c) Thomas Duffy, Camera Person (47 years old); (d) Dorothy Presser, Typesetter (65 years old); (e) Marion Stensgard, Typesetter, (45 years old); (f) Roger Singer, Assistant Manager (40 years old); and (g) Nathanial Jackson, Darkroom Person (39 years old). Because the printing department was being eliminated as part of the sale of the Warehouse, and that operation was to be subcontracted, the likelihood of layoffs in the department was high. (56.1, ¶ 8).

In or around July 2000, David Nacimas, a clerical/data entry employee resigned. As a result, Martin Lev, the Director of the general merchandise buying department was interested in hiring someone to fill that position. Richard Schwartz arranged for Mr. Lev to interview both Ms. Presser and Ms. Stensgard for the position. (56.1, ¶ 9). On or about July 18, 2000, Mr. Lev and Kenneth Nastro, another manager, interviewed Ms. Presser for that position. (56.1, ¶ 10, Nastro Aff., ¶ 9). Ms. Stensgard was interviewed by Mr. Lev for the position on July 19, 2000, because she had been out sick on July 18,

2000. Mr. Lev believed that Ms. Stensgard was better qualified for the position because she had more experience with computers. Shortly after his interview of her, Mr. Lev offered the job to Ms. Stensgard. She accepted the offer and began working for Mr. Lev the following day, July 20, 2000. (56.1, ¶ 11).

Grocery Haulers informed Key Food that it intended to hire various of the unionized employees who formerly worked in the Warehouse and some of the office employees who were formerly employed by Key Food. Although Key Food could not dictate to Grocery Haulers which Key Food employees should be hired, Key Food requested that Grocery Haulers interview the printing department employees to determine whether one or more of the printing department employees possessed other skills or experience that Grocery Haulers might need. Grocery Haulers agreed to interview them. (56.1, ¶ 12).

At or about the time of the sale of the Warehouse operations to Grocery Haulers, David Markowitz, the Director of Human Resources of Grocery Haulers, invited the employees working in Key Food's printing department to interview for potential positions with Grocery Haulers. Despite Mr. Markowitz's invitation, Ms. Presser was the only employee in the printing department who declined to be interviewed. (56.1, ¶ 12). Nonetheless, at Key Food's request, Mr. Markowitz went to the printing department to interview her. As a result of that interview, Markowitz believed that if Grocery Haulers could not offer Ms. Presser the same job as she had with Key Food, she would not be interested in a position with them. (56.1, ¶ 14).

Three employees who had previously worked in the printing department with Ms. Presser were offered positions with Grocery Haulers in or about July 2000: (a)

Nathanial Jackson, who was 39 years old; (b) Janice Leanza, who was 50 years old; and (c) Roger Singer, who was 40 years old.  Grocery Haulers hired them because it had comparable jobs available for them; Robert Berge (55 years old) and Thomas Duffy  (47 years old) were not offered positions.  (56.1, ¶ 15).

Approximately one week after the Warehouse closed, Mr. Schwartz called RGD Graphics, a local typesetting service, to inquire about using their services for Key Food.  A representative of RGD Graphics informed Mr. Schwartz that the Company was looking for experienced typesetters.  Mr. Schwartz called Ms. Presser at home to inform her about the possible job opportunity.  (56.1, ¶ 18).

In conjunction with the closure of the Warehouse, Key Food offered those employees who were laid off on or about July 29, 2000, and who did not belong to the union, one week of severance pay for each year of service, up to ten weeks, in exchange for a general release of claims.  Shortly after Ms. Presser's termination, Vincent McCarthy, the Payroll Coordinator at Key Food, called her and asked her to come in to sign the Release and to pick up her severance check.  Ms. Presser did not come in.  (56.1, ¶ 20).  Key Food thereafter, on or about September 6, 2000, sent Ms. Presser a check in the amount of $2,268.97, representing the total amount due to her for accrued vacation and sick days, less lawful deductions.  Because she refused to sign the Release, Ms. Presser did not receive a severance payment.  (56.1, ¶ 21).

On or about January 22, 2001, Ms. Presser filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  Key Food denied the allegations contained in the charge of discrimination.  On or about August 10, 2001, the EEOC issued a Dismissal and Notice of Rights letter to Ms. Presser stating

that "[b]ased upon its investigation the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (56.1, ¶ 22).

**DISCUSSION**

## I.      Summary Judgment Standards

Summary judgment under Fed. R. Civ. P. 56(c) is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When evaluating a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)).  The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Instead, the opposing party "must designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  A genuine factual issue exists if there is sufficient evidence favoring the opposing party for a jury to return a verdict in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The determination of whether a class meets the requirements of Rule 23 must be performed separately from a summary judgment evaluation on the merits.  See generally Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974).  However, Rule 23 "does not require that class certification be addressed first." Schweizer v. Trans Union Corp., 136 F.3d

233, 239 (2d Cir.1998). "It is well within the court's discretion to determine the merits of the claim before acting on class certification." <u>Solla v. Aetna Health Plans of New York Inc.</u>, 14 F.Supp.2d 252, 254 n.1 (E.D.N.Y.1998).

Finally, while this Court must be cautious about granting summary judgment in a discrimination case because the employer's intent is often at issue "and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination," <u>see Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999), the "summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 533 (2d Cir. 1991). "[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – [therefore] apply no less to discrimination cases than to commercial or other areas of litigation." <u>Id.</u> (citation omitted).

## II. Presser's WARN Act Claim

### A. Who must receive notice?

The WARN Act requires covered employers to provide 60-day written notice, before a plant closing or mass layoff, to each affected employee or her representative. 20 U.S.C. § 2102(a).

The relevant definitions of this requirement are as follows: A "plant closing" means the "permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part time employees." <u>Id.</u>, § 2101(a)(2).

A "mass layoff" is a reduction in force which (a) is not a result of a plant closing;

and (b) results in a layoff of employees defined by the statute in terms of number and percentage.  See Id., § 2101(a)(3).

"Representative," as used above, means "an exclusive representative of employees," that is, a recognized collective bargaining unit.  See Id. § 2101(a)(4); 20 C.F.R. 639.6(a).

The term "affected employees" means employees who may reasonably be expected to experience an "employment loss" as a consequence of a proposed plant closing or mass layoff by their employer.  See Id. § 2101(a)(5).

An "employment loss" means either (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement; (b) a layoff exceeding 6 months; or (c) a reduction in hours of work of more than 50 percent during each month of any 6-month period.  See Id. § 2101(6).  The court applies a "practical, effects-driven analysis of whether a break in employment actually occurred" to determine whether the transaction caused an employment loss that triggered the WARN Act's notice requirements.  Gonzalez v. AMR Servs. Corp., 68 F.3d 1529, 1531 (2d Cir.1995) (per curiam).

**B.  Notice requirements**

WARN Act notices must comply with the statutory requirements of 20 U.S.C. § 2101, et seq., described above, and the implementing regulations codified in 20 C.F.R. § 639.  See 29 U.S.C. § 2107 (authorizing the adoption of regulations by the Secretary of Labor).  29 U.S.C. § 2107 provides that the "inclusion of notice in the employee's paycheck will be considered [an] acceptable metho[d] for fulfillment of the employer's obligation to give notice."

The CFR prescribes additional requirements, providing that notices are to contain:

> (1) The name and address of the employment site where the plant closing or mass layoff will occur, and the name and telephone number of a company official to contact for further information;
> (2) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed a statement to that effect;
> (3) The expected date of the first separation and the anticipated schedule for making separations;
> (4) The job titles of positions to be affected and the names of the workers currently holding affected jobs.

20 C.F.R. § 639.7(c). The same section provides that notices to unrepresented affected employees are to be written in "language understandable to the employees" and are to include:

> (1) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;
> (2) The expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated
> (3) An indication whether or not bumping rights exist;
> (4) The name and telephone number of a company official to contact for further information.

29 C.F.R. § 639.7(d)

In considering whether a particular notice has satisfied the statutory and regulatory requirements, the Court notes the statute's pragmatic purpose of giving workers sufficient advance notice that a layoff will occur so they can prepare themselves for the transition. The implementing regulations aim "to establish clear principles and broad guidelines which can be applied in specific circumstances . . . [recognizing] that Federal rulemaking cannot address the multitude of industry and company-specific situations in which advance notice will be given." 20 C.F.R. § 639.1(b). In that vein,

consistent with the "practical, effects-driven analysis" that has been applied to the employment loss analysis under WARN, <u>Gonzalez</u>, 68 F.3d at 1531, "[i]t is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN." 2o C.F.R. § 639.7(a)(4).

## C.    Additional notices

The C.F.R. specifically provides that additional notices may be sent to extend the period of time before layoffs occur.  The Code provides:

> Additional notice is required when the date or schedule of dates of a planned plant closing or mass layoff is extended beyond the date or the ending date of any 14-day period announced in the original notice as follows:
>
> (a) If the postponement is for less than 60 days, the additional notice should be given as soon as possible to the parties [entitled to notice] and should include reference to the earlier notice, the date (or 14-day period) to which the planned action is postponed, and the reasons for the postponement.  The notice should be given in a manner which will provide the information to all affected employees.
>
> (b) If the postponement is for 60 days or more, the additional notice should be treated as new notice subject to the provisions of . . . this part. Rolling notice, in the sense of routine periodic notice, given whether or not a plant closing or mass layoff is impending, and with the intent to evade the purpose of the Act rather than give specific notice as required by WARN, is not acceptable.

20 C.F.R. § 639.10(b).

## D.    Presser's claim

It is undisputed that Key Food was a covered employer and that the sale of the Warehouse operations constituted a WARN-event, requiring it to provide 60-day written notice to each affected employee or her representative.  Moreover, it is

undisputed that Presser was an unrepresented affected employee who was laid off effective July 29, 2000.  Thus, as a non-union employee, she was entitled to written notice of the pending layoff no later May 30, 2000.

Plaintiff cannot reasonably dispute that the letter dated March 10, 2000 was a legally effective WARN notice.   It is written in plain language and closely tracks the requirements of 20 C.F.R. § 639.7(d).  With due consideration that the regulations are not intended to penalize minor, inadvertent errors, any challenge to the technical sufficiency of the letter is simply unavailing.[1]  Similarly, the additional notices plainly fulfill the requirements of 20 C.F.R. § 639.10.  They refer back to the original notice, identify the new date on which the layoff is anticipated, and generally state that continued negotiations required a postponement of the transaction and the layoffs.

Moreover, there are no grounds on which to find that the additional notices were "rolling notices," prohibited by 20 C.F.R. § 639.10(b).  It is clear from the circumscribed period of time in which the notices were distributed and in which the transaction occurred that these were not rolling notices "in the sense of routine periodic notice, given whether or not a plant closing or mass layoff is impending and with the intent to evade the purpose of the Act," 20 C.F.R. § 639.10(b), but notices regarding an actual transaction under negotiation, which Key Food anticipated would result in a plant closing and mass layoff.

Presser's WARN Act claim stands or falls upon her deposition and affidavit

---

[1]  The Court notes that the period between March 10 and May 1 is only 52 days, 8 fewer days than the statutorily-required 60-day notice.  This is ultimately of no consequence because Presser actually worked and received wages through July 29, 2000.  Cf. 29 U.S.C. §2104(2)(a) ("The amount for which an employer is liable . . . shall be reduced by any wages paid by the employer to the employee for the period of the violation.").

testimony in which she asserted that she never received any notice of the plant closing prior to the additional notice that was sent around June 22. That assertion, however, contradicts her earlier signed adoption of the statement that she had received the March 10 letter from Mr. Pallitto, evidenced on the signature log produced by Key Food. (See Pallitto Aff., Ex. 6). And it is belied by the undisputed testimony of Phillips and Pallitto as to the actions Key Food took to distribute the letters. The bald assertion made by Plaintiff's counsel that the signature log was a complete fabrication, doctored by Defendants in response to this claim and in furtherance of a persecutory conspiracy, is unsupported by any evidence in the record.

It is well-established that a party opposing summary judgment "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." Quinn v. Syracuse Model Neighhborhood Corp., 613 F.2d 438, 445 (2d Cir.1980). Similarly, it is well-established that a party may not create a triable issue of fact by submitting an affidavit contradicting prior sworn testimony. See, e.g., Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir.1991). There is simply no evidence that Ms. Presser's version of events is anything other than fanciful; it is worthy to note that the record lacks a single statement from any other of the myriad non-union employees who were laid off attesting that they failed to receive any of the four WARN notices or challenging their signatures on the receipt log. Moreover, though the prior adopted statement on the signature log was not sworn, in light of Trans-Orient and similar cases, to allow Presser to create a triable issue of fact merely by denying the authenticity of a document which bears her signature, in the absence of any other indication on which one could conclude that the document is

fraudulent, would defeat the salutary purposes of summary judgment.

For the foregoing reasons, Defendant's motion for summary judgment is granted.

## III.    Presser's Motion to Further Amend the Complaint

### A.    Legal standards

Rule 15(a) of the <u>Federal Rules of Civil Procedure</u> dictates that leave to amend a complaint should be freely given absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). Ultimately, however, "the decision of whether to allow plaintiffs to amend their complaint is left to the sound discretion of the district court." <u>Acito v. IMCERA Group, Inc.</u> 47 F.3d 47, 50 (2d Cir.1995).

### B.    Additional named plaintiffs

Plaintiff's motion to further amend the Complaint to include John Asem, Dayon Brown, Robert Cox, James Curatello, Edward Santarelli, and Levi Walkes in her WARN Act cause of action is futile, because these prospective plaintiffs do not have an actionable claim which can survive defendant's motion for summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Milanese v. Rust-Oleum Corp.</u>, 244 F.3d 104, 110 (2d Cir.2001) ("[E]ven if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a

matter of law under Fed.R.Civ.P. 56(c).").[2]

The WARN Act imposes different obligations upon an employer with respect to its unionized and non-unionized employees. See supra, II.A. The employer fulfills its WARN Act obligation to unionized employees by providing notice to a representative of the union; it need not provide personal notice to each union employee. 29 U.S.C. 2102(a)(1). The prospective plaintiffs above-named were members of the Union at the time of the Warehouse sale. (See Asem Aff., ¶ 1; Cox Aff., ¶ 1; Curatello Aff., ¶ 1; Santarelli Aff., ¶ 1, ¶ 8 (identifying Dayon Brown)). The undisputed evidence in this case demonstrates that not only did Key Food provide sufficient WARN notice to the Union, but none of the named individuals were "affected employees," because they all continued to work at the Warehouse as employees of Grocery Haulers, suffering no employment loss as a result of the transaction.

The undisputed evidence demonstrates that Defendant properly noticed John Gilligan, President of the Union, with the March notice and the three additional notices. These notices are supported by the certified mail receipts demonstrating that they were sent. (See Pallitto Aff., Exhibits 2, 8, 13, 17). Plaintiff has provided no evidence

---

[2]  Plaintiff suggests that the "law of the case" doctrine entitles her to amend the Complaint as of right because she was granted leave to amend in 2003. This misapprehends both the law of the case doctrine, which "'ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court," as well as Fed. R. Civ. Proc. 15(a), the procedure for amending a complaint. Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 44 (2d Cir.2005) . No principle precludes a district court from granting leave to amend upon one motion for one reason, and denying it upon a second for a different reason.

disputing these notices.[3]  Moreover, Grocery Haulers hired all of the union employees to continue operations at the Warehouse.  (See Pallitto Aff., ¶¶ 21-22; Curatello Dep. at 8; Cox Dep. at 14).  Therefore, under the "practical, effects-driven analysis" the court employs, none of the prospective plaintiffs suffered an employment loss.  See Gonzalez, 68 F.3d at 1531.

The heart of these prospective plaintiffs' grievances is dissatisfaction with their union representation.  This complaint, however, is not the proper vehicle for considering the legitimacy of the recognized collective bargaining representative at the Warehouse.  Because none of these prospective plaintiffs' claims can survive defendants' motion for summary judgment, the motion to further amend the complaint is denied as futile.

## C.    Amended description of the class

Presser also moves to amend her description of the class.  Specifically, she seeks to amend subsection (a) to Paragraph 13 of the Amended Complaint, which reads:

> Plaintiffs, Employees A,B,C, etc., are union and non-union individuals who were laid off on or about 1998 through 2001 and who did not have proper WARN Act notice, and who did not sign certain releases of claims, which releases were unsuccessfully procured by Key Food through the threatened withholding of accrued employee benefits.

Amended Complaint, ¶13(a).  The proposed subsection 13(a) would read:

> Plaintiffs, Dorothy Presser, John R. Asem, Dayon C. Brown, Robert Cox,

---

[3]  Plaintiff must point to admissible evidence to establish an issue of triable fact.  Fed. R. Civ. Proc. 56(e).  Counsel's speculation in the Memorandum of Law does not constitute evidence.  See, e.g., Giannullo v. City of New York, 322 F.3d 139, 143 (2d Cir.2003) (defendant's memorandum of law is not evidence).  See also DeFilippo v. New York State Unified Court System, Slip Copy, 2006 WL 842400 at *17 (E.D.N.Y.2006) (where plaintiff argued in his memorandum of law that "there was systemic theft and corruption" in the court system, identifying several investigations into the conduct of certain judges, he had failed "to raise a triable issue of fact by offering admissible evidence to support a factual dispute.").

> James Curatello, Edward Santarelli, Levi Walkes, and a Class of Former
> Employees Similarly Situated, who appear on the annexed listing as to the
> Second Claim for Relief under the WARN Act, who were laid off on or
> about 1998 through 2001, who did not have proper WARN Act notice, who
> did not complete certain releases of claims (Subclass I, II and III), which
> releases Key Food attempted to procure through threatened withholding
> of accrued paid leave payouts and collectively bargained severance
> entitlements, who may have signed then repudiated the releases, or who as
> union members may have signed releases lacking consideration, nullifying
> the legal effect of said releases (Subclass IV), claim statutory damages in
> the form of salary and benefits pursuant to the WARN ACT.

Curran Aff., Exhibit B (footnote omitted).

Plaintiff describes these as "minor, cosmetic changes giving practical effect to the Court's 2003 Order permitting discovery, in order to incorporate said discovery into the pleadings." Pl. Mem. Supp., 11. This is a misleading characterization.

In Presser II, this Court granted Presser's motion to amend the Complaint to include a class of non-releasing employees who received ineffective WARN Act notice in relation to the Warehouse closing.[4] The Court simultaneously denied her request to include a class of plaintiffs who claim to have repudiated their releases or signed invalid releases. The Court held that Presser could not adequately represent their interests and that questions of whether releases were void would have to be litigated by members of that class prior to addressing the individual WARN Act claims. See Presser II, 218 F.R.D. at 57-59. Furthermore, the Court noted that the validity of an individual's waiver of claims is not a question well-suited to class treatment. Id. (citing Ciarlante v. Brown

---

[4] Presser II allowed for the pleading of a class to include non-releasing employees "over the three year period prior to Plaintiff instituting suit as part of Defendant's plant closing and/or mass layoff." Presser II, 218 F.R.D. at 58. In the present light, where there is no evidence of any WARN event other than that of the July 29, 2000 closing of the plant and this Complaint was filed on December 3, 2001, this grant was overly broad. The only non-releasing employees who may be implicated are those who received ineffective WARN notice related to that July 29, 2000 closing.

& Williamson Tobacco Corp., 1995 WL 764579, at 2 (E.D.Pa.1995) (certifying in WARN Act case a class of employees who did not sign releases of their claims while denying certification to a class of employees who did sign releases)).

Plaintiff acknowledges that she "seek[s] to reopen the issue of the validity of releases," on the basis of facts unearthed in discovery. (Pl. Mem. Supp., 12.) And, indeed, at least one of the proposed additional plaintiffs, John Asem, would be a member of the denied signer class. (See Pl. Mem. Supp., 12 n.18 ("Asem . . . signed release then revoked, signed to get severance only . . .")).[5] This is not a cosmetic change, but an effort to revisit a determination of this Court and expand the scope of the proposed class. The Court will not revisit this issue, not only for the reasons stated in Presser II, but in light of the fact that in the years which have transpired since Presser II, exhaustive discovery has been concluded and summary judgment motions submitted. Expanding the scope of this case to include plaintiffs who allege an invalid waiver of their claims would not only constitute an unjustified reversal of this Court's previous ruling, but would be prejudicial to Defendant, which has submitted a dispositive motion on the assumption that the validity of waivers obtained is not presently before the Court.

For the foregoing reasons, the motion to amend the Complaint is denied.

## IV.     Motion for Class Certification

### A.     Legal standards

Rule 23 of the Federal Rules of Civil Procedure provides that members of a class may only sue on behalf of the proposed class if:

---

[5] Moreover, as a Union member, Asem's claim would be futile based on Key Food's undisputed notice to the Union President.

>        (1) the class is so numerous that joinder of all members is impracticable;
>        (2) there are questions of law or fact common to the class; (3) the claims or
>        defenses of the representative parties are typical of the claims or defenses
>        of the class, and (4) the representative parties will fairly and adequately
>        protect the interests of the class.

Fed. R. Civ. Proc. 23(a). Moreover, because Plaintiff proceeds only under Rule 23(b)(3),

see Presser II, 218 F.R.D. at 57 n.4 (rejecting plaintiff's contention that the class could

be certified under Rule 23(b)(1) or 23 (b)(2)), she must also show that the common

questions of law and fact "predominate over any questions affecting only individual

members," and that the class action "is superior to other available methods for the fair

and efficient adjudication of the controversy." Fed. R. Civ. Proc. 23(b)(3).

### B.     Plaintiff's motion for certification

Plaintiff moves for class certification of four subclasses:  Subclass I comprises

"union and non-union employees who were not offered, who did not sign, who refused

to sign, who signed then revoked or who refused to complete the signing of the two

versions of multi-part releases of claims." (Curran Aff., Exhibit 1 at 4). Subclass II

comprises individuals who had "a reasonable expectation of recall terminated by the

purported plant closing/mass layoff." (Id. at 10). Subclass III is purportedly composed,

pursuant to the holding of United Mine Workers of America v. Martinka Coal Co., of

employees laid off between March 2000 and July 29, 2000. See Martinka, 202 F.3d 717

(4th Cir.2000) (holding that where coal mining corporation gave all its employees 60

days' notice that mine would close down, and then laid off 89 employees the next day, it

violated WARN's 60-day notice requirement with respect to the 89 employees). (See

also Curran Aff., Ex.1 at 12). And finally, the subclass IV would include union employees

who signed void or voidable releases. (Id. at 15). "When subclasses are requested by the

moving party . . . it is generally settled that each subclass must independently satisfy class action criteria." Newberg on Class Actions § 3:9 (4th ed.2002). Each of the proffered subclasses is defective.

Subclass I fails under Rule 23(a)(3) and Rule 23(a)(4).[6] First, the proposed subclass as defined lacks any typicality in the composition of its members' claims. It combines employees who refused to sign releases with those who signed allegedly incomplete releases and those who signed complete releases but then attempted to revoke them. All of this is set against a background in which the proposed subclass members contend that they did not receive sufficient notice, though Presser acknowledges that she received the June 22 notice. The essence of the typicality requirement is "to assure that the interests of the representative are aligned with the common questions affecting the class," Newberg, supra, § 3:13. As observed in a similar context in Presser II, although Presser's interests are not directly opposed to the other members of this proposed subclass, she has no incentive to prove, for example, that other plaintiffs might not have received the June 22 notice, that certain releases were incomplete, or that certain signed releases are void, all of which are "issue[s] that must be litigated by this class before the WARN Act claim can be addressed." Presser II, 218 F.R.D. at 59. For this reason, Presser also fails as an adequate representative of the class. See id., citing Greeley v. K.L.M. Royal Dutch Airlines, 85 F.R.D. 697, 700

---

[6] Because the subclass clearly fails the typicality and adequacy of representation requirements, the Court need not consider whether Plaintiff has shown numerosity or common questions of law and fact. The Court notes, however, that not a single sworn statement has been proffered from any other non-union member with a claim similar to Presser's and that the statute imposes different legal obligations upon the employer with respect to notifying union and non-union employees, both of whom are included in the same subclass. Moreover, because the subclass fails under Rule 23(a), the Court need not consider whether Rule 23(b)(3) has been satisfied.

(S.D.N.Y.1980) (where plaintiff moved to certify a class of airline passengers whose luggage was lost or damaged, including passengers who settled with the airline, the district court found that the named plaintiff, who had not settled, could not adequately represent the interests of the rest of the class).

Subclass II fails because there is no named plaintiff with standing as a member of the class. Cf. O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes a requisite case or controversy with the defendant, none may seek relief on behalf of herself or any other member of the class."). Moreover, amendment to include such a plaintiff would be futile because Defendant would in any event be entitled to summary judgment against any named plaintiff who could be included in the class. Plaintiff's theory of this subclass, that the layoffs terminated a "reasonable expectation of recall" borne by former employees not actually working for Key Food at the time of the announcement or the plant closing, thus entitling those employees to WARN Act notice, is unsupported by precedent or the plain meaning of the statute. Even if such individuals were entitled to notice, however, Plaintiff acknowledges that such notice is based entirely on rights secured to them under the collective bargaining agreement in place at the warehouse. (See Pl. Mem. at 23). By definition, then, the members of this subclass would have been Union members, against whom it has already been shown the Defendant is entitled to summary judgment. The undisputed facts demonstrate that Key Food properly notified the Union President. Thus, this subclass cannot be certified.

Subclass III alleges a number of so-called "Martinka" Plaintiffs. In United Mine Workers of America v. Martinka Coal Co., 202 F.3d 717 (4th Cir.2000), in connection

with the planned closing of a coal mine on December 5, 1995, Martinka Coal Company gave notice on October 2, 1995 to more than 300 employees at the site. 89 employees were laid off on the next day, while the remaining employees were to be laid off in December. Addressing an ambiguity in the drafting of the WARN Act, the Court of Appeals for the Fourth Circuit rejected an interpretation that allowed for the possibility that "when an employer, in anticipation of a plant shutdown, lays off employees <u>before</u> the physical shutdown of the plant, those employees need not be given 60 days' notice of their layoffs." <u>Id.</u> at 721. The Court held that "under the WARN Act, when an affected employee's layoff date is earlier than the date of the plant shutdown, the affected employee is entitled to notice of the closing 60 days before the date of that employee's layoff." <u>Id.</u> at 722. Thus:

> where the employee's layoff date and the plant closing date are not the same, the court must (1) identify a "plant closing" as defined by the Act; (2) identify those employees terminated <u>as a result of</u> the plant closing ("affected employee"); and finally (3) identify the 60th day before any affected employee is laid off as the latest date on which that employee or his representative may be given notice of his termination.

<u>Id.</u> (emphasis in original). In the instant case, Plaintiff moves to certify a class of individuals who were terminated by Key Food between March 3, 2000 and July 29, 2000. Not only is there no named plaintiff to represent this class, there is no evidence of any layoffs between March 3, 2000 and July 29, 2000 that occurred <u>as a result of</u> the planned plant closing. In <u>Martinka</u>, it was undisputed that there were layoffs in two phases, but that each phase was caused by the planned plant closing. Here, Plaintiff has simply identified every individual who was terminated, for whatever reason, from the payroll of Key Food between March 2000 and July 2000, and concluded, without any

evidence and based entirely on speculation, that these terminations were caused by the planned sale of the warehouse operations. Because there is no named plaintiff to represent the class, and because there is no evidence of any layoffs, prior to the July 29, 2000 sale to Grocery Haulers, that occurred <u>as a result of</u> the transaction, this subclass does not satisfy the requirements of Rule 23(a) and can not be certified.

The final subclass proposed by the plaintiff, of union members who signed void or voidable releases, is precisely the "signer" class that was rejected by the Court in <u>Presser II</u>. <u>See</u> 218 F.R.D. at 58-59. As discussed <u>supra</u>, Section III.B., the Court finds no reason to revisit its ruling denying the amendment of the Complaint to include this purported subclass, the members of which could not survive summary judgment based on the Defendant's notice to the Union President.

## V. The NYSHRL and NYCHRL Age Discrimination Claims

### A. Legal Standards

In evaluating a summary judgment motion on a claim of age discrimination under NYSHRL and NYCHRL, courts apply the so-called <u>McDonnell Douglas</u> burden-shifting analysis. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See also</u> <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 217 (2d Cir.2005) (holding that McDonnell Douglas burden shifting applies to NYSHRL and NYCHRL claims); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n. 1 (2d Cir.2000).

Under the <u>McDonnell Douglas</u> burden-shifting regime, recently restated in <u>Woodman v. WWOR-TV, Inc.</u>:

> [A] plaintiff bears the initial burden to establish a prima facie case of age discrimination by showing that (I) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job;

28

(iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone substantially younger. [The Court of Appeals has] characterized plaintiff's prima facie burden as minimal and de minimis.

A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate nondiscriminatory reason for the challenged employment action. If the defendant articulates such a reason, the presumption of discrimination drops out and the plaintiff musts prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. In short, the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited age discrimination occurred.

Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir.2005) (internal quotations and citations omitted).

### B.    Application to Presser's Claim

Defendant contends that Presser cannot establish a prima facie case of age discrimination in relationship to her termination because, even assuming that she established the first three elements of the prima facie case—(1) membership in the protected class; (2) qualification for her job; and (3) adverse employment action—the circumstances of her termination by Key Food belie an inference of discrimination. Specifically, Presser's termination occurred as a result of her employer's wholesale discontinuation of the operations at the Warehouse facility. Hundreds of workers – regardless of age – were laid off, including every last individual working in Presser's department at the time of the sale of the Grocery Haulers takeover. These layoffs were plainly necessary as Key Food no longer owned the operations at the Warehouse; keeping those hundreds of workers on its payroll would simply be superfluous. Thus, Key Food contends that plaintiff has failed to carry even her de minimis burden of

establishing circumstances giving rise to an inference of discrimination.

In response to this argument, Plaintiff abandons the allegation in the Complaint that Key Food "terminate[d] Plaintiff on account of her age." (Am. Compl., ¶ 36). Rather, she argues that Key Food discriminatorily failed to place her in a new position, in anticipation of the lay off, when others including Stensgard were able to obtain either internal transfers or new positions with Grocery Haulers:

> Defendant's brief argues the wrong argument. It focuses on Plaintiff's ultimate layoff, but the window of the discriminatory act occurred between July 18, 2000 and July 20, 2000 when Plaintiff was denied a transfer and hiring, which was further compounded by her termination (i.e., she could have been transferred instead of being terminated).

(Pl. Mem. in Opp., at 18). Plaintiff essentially presents a discriminatory reduction in force claim. Under this construction, on the improper basis of age, Key Food protected certain workers, but not Presser, from the effects of the layoff.

In Burger v. New York Institute of Technology, the Court of Appeals explored the contours of such a claim in language eerily applicable to this case:

> We illustrate by analyzing two polar hypotheticals. In the first, an older maintenance employee is laid off when a company shuts down a plant. The older employee could not prevail on an ADEA claim simply because a younger maintenance employee continued to be employed by the company in a similar plant, no matter how identical their responsibilities. The rationale for granting judgment against the older worker would be that no reasonable trier could find that the shutting down of a plant was motivated by the age of the older maintenance person. In the second hypothetical, a company with a phone bank lays off the oldest operator. The company could not prevail on a motion for judgment as a matter of law in such a case on the theory that a desire to eliminate the particular phone used by that operator was the sole motive for the lay-off.

Burger v. New York Institute of Technology, 94 F.3d 830, 833 (2d Cir.1996). Presser's claim is almost precisely the first of the two "polar hypotheticals," which will not sustain

a discrimination claim. It is undisputed that in the period preceding the sale of the Warehouse operations, Key Food made gratuitous efforts to find alternate employment for many employees, including Presser, that it anticipated would be laid off. Plaintiff was told as much by Mr. Lev and Mr. Nastro for the clerk position in the buying department. When asked about that interview, she testified as follows:

> Q:   . . . Do you recall whether Mr. Nastro said anything during this interview?
> A:   I think Mr. Nastro said he would like me to stay and see if I could work for Mr. Lev.
> Q:   Do you recall anything else that Mr. Nastro said?
> A:   No, just that he was looking to get me employed for – by Key Food.

(Presser Dep. at 64). Conceding, as she must, that her termination was not discriminatory, as it resulted from the wholesale discontinuation of Key Food's operations at the Warehouse, Presser would interpret Defendant's success at transferring some affected employees as creating an affirmative duty to have found for her another position internally. The law did not require as much of Key Food, notwithstanding its unnecessary efforts to do just that. The fact that Key Food successfully placed some workers, including, as Plaintiff points out, some older and similarly-protected employees such as Claudette Kendall (age 59), Rosa DiMaria (age 53), Maria Piccolo (age 45), and Stensgard (age 45), (see Pl. Mem. in Opp. at 20), does not give rise to an inference of discrimination against Presser.

The result is the same if the Court views the claim as a discriminatory "failure to hire," on the basis that Key Food interviewed both Stensgard and Presser for the position that became available in the buying department weeks before the layoff, but ultimately chose to hire Stensgard. Assuming that Presser stated a prima facie case of

age discrimination, Key Food has provided a legitimate nondiscriminatory reason for having hired Stensgard. Mr. Lev, who made the decision to hire Stensgard, stated:

> [The day after interviewing Presser], I interviewed Ms. Stensgard for the clerk position. During the course of the interview I determined that Ms. Stensgard was more qualified for the position because she was familiar with Microsoft Excel and computers generally, as well as the Consolidated File which was used by the various grocery stores who were members of the co-operative. Ms. Stensgard also appeared flexible and positive about the job opportunity. I offered the job to Ms. Stensgard shortly after the interview.
>
>                           ***
>
> I chose to hire Ms. Stensgard because I believed her to be more qualified for the position.

(Lev. Aff., ¶ 4, 6).

Mr. Lev's impression that Ms. Stensgard appeared more familiar with certain computer software and files, and that she seemed more flexible and positive about the job opportunity are legitimate, nondiscriminatory reasons to prefer one candidate over another in hiring. Moreover, Presser does not dispute that Stensgard was qualified for the clerk's position, or suggest that her own qualifications were superior. To the contrary, she submits that they "were both Typesetters and did the exact same work in the Printing Department. There was no difference between [their] skills." (Presser Second Aff., ¶ 9).

"[T]he court must respect the employer's unfettered discretion to choose among qualified candidates." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir.2001) (quoting Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C.Cir.1996)). Confronted with a hiring decision between Presser and Stensgard, who in Plaintiff's opinion had the exact same skill set, "[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual

makes during an interview." Byrnie, 243 F.3d at 104 (internal quotation omitted).

Indeed, in a choice between two employees who have objectively similar skills, an

employer might naturally choose based on subjective criteria. First impressions count.

In response to this nondiscriminatory justification for hiring Stensgard, Plaintiff

has provided no basis on which a reasonable juror could conclude that Mr. Lev's

proffered justification was pretextual. Plaintiff points to statements made by other Key

Food employees indicating that Presser had said she "wasn't getting any younger," or

that she was "ready to retire." (See, e.g., Pl. Document Appx. Part VI, "Five unsworn

statements," Statements of Stensgard and Nastro). Presser denies having made those

statements, and cites Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120

S.Ct. 2097 (2000) to assert that a jury could infer based on her denial that not only did

those employees fabricate their testimony, but that the fabrication provides evidence of

discrimination in the hiring of Stensgard over Presser. The logic of these inferences,

however, is faulty. Reeves stands for the principle that "a plaintiff's prima facie case,

combined with sufficient evidence to find that the employer's asserted justification is

false, may permit the trier of fact to conclude that the employer unlawfully

discriminated." Id. at 148 (emphasis added). It is undisputed that Mr. Lev made the

decision to hire Ms. Stensgard. Even assuming that other employees made false

statements, however, they have no bearing on the truth or falsity of the asserted

justification given by Mr. Lev for hiring Stensgard. Because Plaintiff has failed to

provide any evidence that Mr. Lev's asserted justification was false, she has failed to

rebut Defendant's legitimate, nondiscriminatory reason for its hiring decision.

Plaintiff's counsel also went to great lengths through discovery to assemble

extensive payroll records of Key Food for the period of 1998 through 2002, and set out

to derive through complicated arrangements and statistical analysis of personnel related

transactions, evidence of discriminatory patterns and practices.  (See, Pl. Ex. "Office

Workers' Staffing Analysis on the Basis of Age Groups," and "Supplemental Employee

Databases for Office Workers ("FTT") for 1998-2002 Based on Discovery Materials.").

Counsel submits that his analysis demonstrates pretext in the failure to hire Plaintiff

based on "a picture of general ageist intent." (Pl. Mem. in Opp. at 22).  In a decidedly

different context, but with particularly apposite language, the California Supreme Court

has cautioned courts as to its "strong feelings that such applications [of mathematical

techniques in the proof of facts] . . . must be critically examined in view of the

substantial unfairness to a defendant which may result from ill conceived techniques

with which the trier of fact is not technically equipped to cope." People v. Collins, 68

Cal.2d 319, 332, 438 P.2d 33, 41, 66 Cal.Rptr. 497, 505 (1968) (holding that testimony of

mathematics instructor on mathematical theory of probability, without adequate

evidentiary foundation or adequate proof of statistical independence, constituted

prejudicial error in a robbery conviction).  This Court shares those concerns.  The

mathematical and tabular arrangements submitted by Plaintiff's counsel in an effort to

prove pretext, when critically examined, are demonstrably unsound.  To take only one of

the conclusions upon which Plaintiff relies, that "no individuals age 60 and above were

hired or transferred from 1998 to 2001, although a minimum of 40 individuals were

hired during this period and 15 employees were transferred during this period," (Pl.

Mem. in Opp. at 22), the analysis fatally fails to consider how many individuals age 60

or above applied for positions during that period or sought transfers.  Moreover, the

data upon which the conclusions are based is not presented to the court in admissible form. <u>See</u> <u>Fed. R. Civ. Proc.</u> 56(e).

Because Presser has failed to establish a prima facie case of a discriminatory reduction in force, or sustain her burden of providing evidence sufficient to support a reasonable inference of age discrimination in the failure to hire Presser, Defendant's motion for summary judgment on the Third and Fourth Claims for Relief, under NYSHRL and NYCHRL, respectively, must be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motions are DENIED and Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to close the case, Plaintiff to take nothing.


SO ORDERED.

Dated:      Brooklyn, New York
           July 25, 2006

                                    _____/s/_____
                                    I. Leo Glasser
                                    United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the Plaintiff</u>

Michael R. Curran
Email: mrc4law@yahoo.com

<u>Counsel for the Defendant</u>

Douglas Peter Catalano
Fulbright & Jaworski, L.L.P.
Email: dcatalano@fulbright.com

Kristen Margaret Kapoor
Fulbright & Jaworski, LLP
Email: kkapoor@fulbright.com

Neil G. Sparber
Fulbright & Jaworski L.L.P.
Email: nsparber@fulbright.cm